Good morning, Your Honor. May it please the Court. My name is Amber Abasi, and I represent the Drakes Bay Oyster Company and its president, Kevin Lunney. I intend to reserve four minutes of my time for rebuttal. We're here today because defendants have thumbed their nose at Congress and the courts. The Secretary of the Interior was granted by Congress the authority to issue a permit to the oyster farm, notwithstanding any other law. But he concluded that doing so would violate the law. Congress also directed that his decision be made on the basis of a sound scientific foundation. But when scientific data regarding the only major adverse impact alleged in the final environmental impact statement was found to be flawed, he simply disregarded the data and made an uninformed decision anyway. And defendants then asserted that the courts had no jurisdiction over their actions. Holding defendants accountable for their actions will benefit not just the oyster farm, its community, the 50,000 visitors each year that come to the farm, and Californians that have an interest in sustainable agriculture, but all Americans that have an interest in decisions being made by their government on the basis of the rule of law and sound science. We respectfully request that this Court maintain the injunction issued by the motions panel until the oyster farm's claims can be given a full, fair adjudication. Roberts, can I ask this just at the outset? Let's say that we agree that there were jurisdiction to review the Secretary's decision here and that we left the preliminary injunction in place. What further proceedings would need to occur on remand before a final judgment could be entered? Further proceedings would need to occur because there would need to be full briefing on the range of the oyster farm's claims. The briefing up to this point has addressed only a subset of the claims articulated in the complaint. Well, what is that? In other words, we have a pretty full record. We have the NEPA analysis. We have the Secretary's decision. We have your objections to it. What are the remaining claims? There are remaining constitutional claims and an APA claim associated with the agency's violation of the Data Quality Act, Your Honor. All right. Maybe you can address, just on the section 124 jurisdictional argument, maybe you can address the government's point that your reading of the statute seems to result in this kind of procedural paradox where we would, the Secretary would need to know the final outcome of the decision he was going to make before he would know what procedures needed to be followed. Can you maybe address that argument for us? Yes, Your Honor. There's no paradox here. This is a statute that was intended to remove legal obstacles to issuance of a permit to the oyster farm. The intent, if you will, was asymmetrical. If the Secretary wanted to simply issue the permit to the oyster farm on the same terms and conditions, he could do so. If he wanted to have a broader range of options, such as increasing the activities at the oyster farm, decreasing them, or denying the permit, however, he would need to conduct the full NEPA process. What's the difference between what authority is given to the Secretary in 124 and what actually happened in the grant deed? I'm looking at the 1970 deed, which basically gives the expiration date, but then the parties agreed that the Secretary may also extend the permit. So what's the difference? The original agreement was that the 40-year reservation of use and occupancy, would terminate in 2012, but that operations at the oyster farm could continue after that date pursuant to a special use permit. That special use permit would be obtained by applying to the National Park Service. Section 124 changed that procedurally by allowing them to apply for a permit directly to the oyster farm. Mr. Basi, why? Oh, I'm sorry. Let's just step back on that, though. It doesn't really change at all. It says in the original agreement, the parties had agreed that the special use permit may be issued, and in Section 124, it says the Secretary of Interior is authorized to issue a special use permit. It doesn't say shall. It basically is discretionary. So I'm having some difficulty understanding the difference you're trying to articulate, so maybe you can help me out on that. Sure. It's important to understand the context in which Section 124 was passed to see this interpretation. They were permitted to issue the special use permit. However, in 2005, the National Park Service wrote a memorandum stating that they believed that due to the 1976 Wilderness Act, among other things, they were not actually legally authorized to issue a permit to the oyster farm. In response to their taking that position in 2005, Congress in 2009 passed Section 124, which reaffirmed that there was authority to issue a permit and granted that authority to the Secretary. So in fact, though, going back to my original question, even though there was the intervening hiccup, if you will, as to what the Park Service thought its authority was, the bookends of this are basically the same, the 1970 grant deed with may issue a special permit and Section 124, which is may issue a special permit, correct? That's correct, Your Honor. This is a discretionary decision, but simply because there is discretion to be exercised doesn't mean there aren't standards by which that discretion can be assessed. That would be helpful, then, if you would move to that, because in looking at whether or not there's jurisdiction under the Administrative Procedure Act, there is jurisdiction unless there is something that's committed to agency discretion by law. Could you point out where you think the mandatory language is that would take it out of that APA exception? Many decisions on permitting are discretionary. NEPA, in fact, only applies to discretionary decisions. This is part of that category of discretionary decisions that can be made by the agency, but which have to be made according to certain procedures. The procedures articulated in NEPA and established by the APA establish standards by which the exercise of that discretion has to be executed. So that presumes, then, that NEPA controls? You have to get to NEPA, in other words, to have jurisdiction. No, Your Honor. We believe that even under the APA, the Secretary's decision did not comply with the law. Okay. Fill me in on that, because I'm reading the APA, and if the Secretary may issue it, which is discretionary, what is it, either in the statute or elsewhere, that says he, she, or he, I guess at the time he, violated the law? The statute says that he can authorize, issue the permit, notwithstanding any other law. That was a very narrow, targeted bit of language that addressed that 2005 assertion by the Park Service that the 76 Act prevented them from issuing a permit. So if that language means anything, it simply means that the Park Service and the Secretary can no longer say that the 1976 Act would make it unlawful for them to issue a permit to the oyster farm after 2012. And is that the position they've taken here? That is the position they've taken here is that the notwithstanding clause excuses them from all procedural and substantive legal obligations. We believe that that's inconsistent with the Ness case that defendants have attempted to use, and with the case of U.S. v. Novak, which discusses how to interpret a notwithstanding clause. The interpretation there has to be assessed against the context of the statute. There needs to be convinced clear evidences and statutory intent that there was a conflict between the law that's asserted to be eliminated by the notwithstanding clause. There's no conflict with NEPA here. Defendants' own actions showed that they were perfectly capable of complying with NEPA because they initiated a NEPA process and started to formulate an environmental impact statement. There were nearly three years between the time that the permit was applied for and the Secretary's decision. They should have complied with NEPA. They did not do so. That brings me to another question, because this seems to be like some of these rubrics cubed, where everything is wrapped inside of each other, these little Russian dolls. Does NEPA apply here? There seems to be a range of cases in NEPA, some of which say that if you have an action that has a beneficial effect on the environment, then you don't need an EIS. You don't have a major Federal action. Yes, Your Honor. In response to your order of May 10 with questions specifically regarding those issues, whether NEPA is required when an action has solely beneficial effects is an open question in this circuit. Humane Society v. Locke notes, however, that the balance of authorities and other circuits recognize that even in that event of an action with solely beneficial effects, NEPA still applies. But that's not this case. Defendants themselves have acknowledged that there will be adverse impacts from the closure of the farm. Closure of the farm requires changes to the existing natural environment, the introduction of barges, chainsaws, ripping out the oyster racks in the Estero, the destruction of nearly 20 million oysters in the waters of the Estero. This is not an action that has solely beneficial effects. It's an action that also is going to have significant adverse effects, and it's going to change the status quo on the ground. Let's say that the Secretary had not issued the order that he did, which actually was, I read as a denial of your request for a permit. But he did nothing. He just, the day came, the day went, and the deed expired. Would NEPA apply? Would an environmental impact statement have been required? NEPA would apply to a Federal action. Failure to act in the face of the permit application under the law would constitute a Federal action. The Court recognized this as well, that the Secretary's decision to deny the permit was, in fact, a Federal action. If the Secretary had decided to reissue the permit on exactly the same terms, would that have been a Federal action that required an environmental impact statement? No, Your Honor. A Federal environmental impact statement would not have been required in that narrow context. This is acknowledged by the statute. Notwithstanding any of the law, a permit can be issued with the same terms and conditions. With the reference to the Espy case that this Court raised, there, NEPA was not required because there was no change to the status quo. There were cattle grazing on the land, there was a legal transfer of title, and then cattle continued to graze on the land. What's relevant is not the legal status, whether there's a permit or whether there's a particular owner of the property, but what is going on on the land. What, how the landscape is being affected by human action. Here, humans have been farming oysters and drakes estero for 80 years. So returning it to its pre-oyster form state would be detrimental? What was it before it was an oyster farm? Before it was an oyster farm, it was simply an estero, waters off the coast of California. And so if we allowed them to dismantle it as an oyster farm, that's when you're saying they'll bring the chainsaws in. But after they dismantle it, won't it return to its natural state? It will return to its natural state eventually, although there will be these impacts to wildlife associated with the removal activities. And there are significant long-term impacts because this is a farm that's open to the public, that thousands and thousands of people visit each year. It's a shining example of sustainable agriculture. That aside, and I think it's, you know, you have really done an excellent job, I think, in your briefs of highlighting a certain amount of uniqueness of this farm and the access and the location. But given that it's sitting in what's already been designated as potential wilderness, and the Park Service is directed, in effect, to return it to wilderness as soon as any nonconforming uses are removed, how do you reconcile your position with the language under the Wilderness Act and the wilderness designation? That's actually one of the points we make in our briefs, Your Honor, is that defendants acknowledged when the 76th Act was being drafted. Initially, the intent was to designate this as wilderness. It was defendants that went to Congress and said, there's retained rights by the state of California to farm, to lease this land, the water bottoms, the bottoms of the Estero, for oyster farming in perpetuity. There's this oyster farm that's been there for decades. These are inconsistent with a wilderness designation, and they continue to be inconsistent with a wilderness designation even today. Can I turn you to a slightly different subject? If we reach the merits of your NEPA claims here, can you just address the defendant's arguments that any NEPA violations were harmless? Yes, Your Honor. The NEPA violations here were not harmless. This is actually an example of exactly why these procedural protections exist. For example, one of the requirements under NEPA is that you adequately respond to expert comments. They were criticized in the draft statement for comparing the oyster tumbler to a highway cement mixer. Their response was to substitute the data on a highway cement mixer for an army cement mixer. Additionally, NEPA requires that they submit the final statement to the EPA, that they issue a record of decision, that they allow 30 days for review by other agencies and the public before a decision is made. The Secretary didn't do that. The Secretary made a decision mere days after publication of the final statement, and what happened there is there was new data alleging adverse impacts to harbor seals in the final statement. That data was derived from the expert report from another agency. The final statement claimed that there were two disturbances to the harbor seals attributable to the farm and used that as evidence that there was adverse impacts from the farm's activities. However, shortly after the Secretary made his accelerated decision, it was revealed that the underlying data showed that there were zero disturbances. This data was fabricated. This is not a matter of interpretation, experts disagreeing. This is a matter of misrepresentation of data from another agency. And if they had followed the NEPA process, if they had given the full review period, this might have been uncovered before the Secretary had a chance to make his decision. But I guess I read the Secretary's decision as basically saying, look, I understand that there's a dispute as to the science here, but I'm going to set aside all of the disputed issues and focus my attention on other grounds. And it seemed to me that at least the basis that was stated in the decision by the Secretary had nothing to do with the kinds of issues you're talking about. Well, that's one of the things about the Secretary's decision that we think is unlawful, Your Honor, is that he doesn't specifically address how the choice he made is rationally related to the facts. He alleges that he's not considering data that's alleged to be flawed. We believe that means the Soundsgate data. But what data remains is the Harbor Seal data, which we've showed misrepresents the findings of another agency, and then findings on wilderness which are not based in science. NEPA requires that his decision be made fully informed, considering the environmental impacts of all reasonable alternatives. He couldn't have done that because the data was flawed, and what he did instead was to simply disregard scientific data. He couldn't have made the informed decision that the law requires, and he didn't make it. But at the end of the day, this really is a policy call. I mean, there's no science that's going to dictate what the right answer is here. There are competing considerations on both sides of the balance. And at the end of the day, the Secretary said, I think the more important objective is to give effect, essentially, to Congress's intent that this area be returned to wilderness status, and I'm going to put more weight on that than all of the competing considerations. And I just, I guess, help me see how compliance with NEPA would have caused the Secretary to make a different weighing of those competing considerations. I will note, Your Honor, that I'm in my rebuttal time, but I definitely want to answer your question because I think that's very significant. What the Secretary did, his decision is based on a multitude of errors of law. Even if he didn't, wasn't, even if NEPA didn't apply, that decision, that he was effectuating the intent of Congress in the 76 Act to designate this as wilderness is itself a misinterpretation of law. Both of the 76 Acts I discussed earlier, because there was no intent to designate Israel Sestero as wilderness, but only as potential wilderness. It also misinterprets Section 124, the sole focus of which was to wipe out the 76 Act as a ground for not issuing the permit. If there's one thing they couldn't do, it would say, on the basis of the 76 Act, I've decided to deny a permit. That's exactly what he did. An agency decision that's based on a misconception of law cannot stand. Let me just follow up on that, and I'm going to give you the time you need for rebuttal. Thank you, Your Honor. We don't want to take it away simply because of our questions. But in looking at the National Academy of Science report, it seems that looking at these various scientific aspects was only required if they were to modify the permit terms. Am I correct about that? There was a specific mandate in Section 124 that the Nass report be considered if terms were to be modified. We, however, do not believe that that eliminates or supersedes other obligations that he had to examine the range of environmental impacts underneath them. Because in that report, which is looking at the scientific issues which you referenced earlier, that report says the ultimate decision to permit or prohibit, such as the Drake's Bay, necessarily requires value judgments and tradeoffs that can be informed but not resolved by science. Isn't that consistent with what the Secretary ultimately concluded? No, Your Honor, it's not, because he wasn't informed by science. The National Academy of Science has also noted that the conclusions that the government made in their environmental impact statement are overstated in terms of adverse impacts, understated in terms of beneficial effects of the farm, and that the conclusions they made about the various harms that the farm creates are highly to moderately uncertain. Of the 13 conclusions, five were highly uncertain and another eight were moderately uncertain. This is an example. I'm sorry. I was going to give you the remaining time for your rebuttal and hear from the government at this point. Thank you, Your Honor. Thank you. Thank you. Good morning. I'm David Gunter. I'm here from the Department of Justice on behalf of the Secretary of the Interior. With me at council table is Stephen McFarlane of DOJ and Barbara Goodyear of Interior. Drake's Bay Oyster Company is located on federal property and uses the unique resources of Drake's Estero within Point Reyes National Seashore to run its commercial business. Up until 2012, it had a clearly established right to do that, fairly bargained with the United States in 1972. But when that right was set to expire in 2012, Congress asked the Secretary to make a new decision, a policy decision, notwithstanding any other provision of law, about whether this particular case should continue to be an exception to the rules that prohibit commercial activity in other wilderness and potential wilderness areas. The Secretary decided that the public is better served by wilderness in Drake's Estero than by Oyster Company. And I can't put it any better than Judge Wofford did a few moments ago, that his decision was based on the incompatibility of commercial activities in wilderness on a policy basis, not on any disputed science and not on any constraints that he felt from other law. Well, let me stop you there, then, because I find somewhat persuasive counsel's argument that the Secretary was trying to give effect to this supposed congressional intent to have the Estero return to wilderness status. But why shouldn't we read Section 124 as Congress's statement to the Secretary that whatever our past statements of policy might have been, forget about those? Because we don't want you to we don't want your decision to be driven by your interpretation of our supposed interest in having this area returned to wilderness status. Your Honor, I think that the Secretary should have and did interpret Section 124 to take away the constraints, the policy constraints that Congress enshrined in law, that Congress placed on him as a constraint about whether or not he could issue the permit or not. But I don't think that it makes sense to read Section 124 as completely doing away with any policy judgment. After all, if Section 124 were intended to take away any potential policy favoring wilderness and only leave policies in favor of oyster farming, then that would be no discretion for the Secretary at all. This may be clear about where I'm coming from. I think you could read Section 124 as saying don't base your decision on a desire to effectuate our past statements of policy. I guess it was mainly in the 1976 Act. There are other considerations that you can certainly take into account, and we're leaving that to your discretion. But whatever thumb you think we've placed on the scale to have this area returned to wilderness status, we're taking that away. Go base your decision on other considerations. And I agree with that. Congress took the thumb off the scale and balanced the scale and said, Secretary, it's your job to make a policy decision and weigh the competing policy interests that you think are important. So, for example, even if you take away the 1976 Wilderness Act, the Park Service has management policies that have been – that interpret the Wilderness Act and have received Chevron deference from this Court. Those policies say that potential wilderness should be managed as wilderness areas and that nonconforming uses should be removed. And that's one of the NPS policies that the Secretary relied on when he made his decision that DDOC shouldn't be allowed to continue. We're obviously concerned about this whole threshold jurisdiction question, not just for Drake's Bay, but also for the Department of Interior. That park management policies, which have the force of law, do they fall within the notwithstanding any other law clause, in your view? Yes. And that is, in fact, the purpose of Section 124. So it was those laws and management policies that would have prevented the Park Service and would have prevented the superintendent of Point Reyes from issuing a new special use permit if DBOC had used the existing procedure of applying for a special use permit according to the Park Service's ordinary regulations. That's what Congress intended to sweep aside. But that doesn't mean that the policy goals behind those regulations and statutes are not still valid considerations for the Secretary to take into account when he's trying to decide. So you're saying that they're not binding, but they're informative? That's right. He said, I recognize that Section 124 allows me to issue this permit, notwithstanding any other provision of law. And so he looked at the issue and he said, what's the best use of this park, setting aside legal constraints? What's the best use? And he went and he listened to the owners of DBOC and the employees and members of the public. He visited the oyster farm. He took many, many public comments, 92 of which — 90 percent of which favored wilderness in this area. And based on all of that, he said, my decision is that the public is better served by wilderness uses in Drake's Estero than by oyster farming. And that's exactly the kind of decision that the Secretary of the Interior has the authority to make, the discretion to make, the expertise to make, rather than having that decision second-guessed by courts and by interests that would rather see commercial activities in wilderness areas. Would you address this issue of whether an EIS was required? As I read the Secretary's decision, he was basically saying, well, I don't think so, but I'm doing it anyway, so I have more information. But, of course, Drake's Bay said that actually removing the farm is a major Federal action. What's your position on why an EIS wouldn't be required? There are three reasons why an EIS would not be required. The one that I think is most important is Section 124 itself and the notwithstanding clause, which sweeps away other laws, including NEPA. Now, NEPA is a procedural statute. It doesn't dictate substantive outcomes. And so there's no conflict between NEPA itself and any particular substantive outcome that the Secretary might reach. But with respect to procedure, DDOC said NEPA does not apply. I'm looking here at Supplemental Excerpt of Record 244. DDOC said, what effect does the NPS's failure to provide you with a legally adequate EIS have on your discretion, not on your ability to issue or to deny, but on your discretion under Section 124? And their answer to that question was, in fact, none. It's a general repealing clause that sweeps aside other law to apply. So that's the first reason. Kennedy. They could well have been wrong. I mean, we're not bound by their interpretation of the statute, so I don't think you get much mileage out of pointing to that letter. Indeed. I'm just pointing out that this is an interpretation of that statute that is so reasonable that even both sides in the case had adopted it at one point. The second reason that NEPA does not apply is that there is no Federal action here. I think, as Judge McKeown pointed out, if the Secretary had done nothing here, if Section 124 had not been passed, if DDOC had not written its letter requesting a new permit, if the Secretary just put that letter in a drawer, then the exact same thing would be happening on the ground on December 1st, 2012, as would be happening after the Secretary's decision. We consider that then agency action or agency inaction? That can only be agency inaction. And the key case in this effect is Alaska v. Andrus, in which the Secretary had authority to close Federal property to Alaska's wolf kill program and simply chose not to exercise that authority. In a similar case, the D.C. Circuit said that agencies would grind to a halt if they had to do an EIS every time the agency declined to exercise its discretion in that way. And Ms. Abbasi just made that point clear when she said that the fact that the agency would grind to a halt if the Secretary had done nothing is a great argument if the Secretary had done nothing. But he didn't do nothing. In fact, and for example, if they had never asked to have the permit re-upped, you know, time would have come and gone and they would have to move their oyster farm. But they asked for a permit and the Secretary didn't do nothing. He actually undertook this huge project and then ultimately issued what I read basically is a denial of Drake's Bay request for a permit. So I'm not quite sure how that fits in because now he's kind of in the soup, so to speak. Well, Your Honor, I appreciate that. But I don't think that the court should penalize the agency for doing more than is required. NEPA either establishes procedures that are required here or it doesn't. Now, the agency is very familiar with NEPA procedures. It understands how to put together an EIS. And that's a valuable way to collect public input and draw all of the information together so that the Secretary can make an informed decision. But just embarking on that process to try and carry out those values of good administrative decision-making doesn't by itself make NEPA apply. Let me ask then, you know, I asked Ms. Abbasi if the Secretary had issued a permit, would EIS apply? And she said no, because that's the status quo and there's a number of cases that say if you keep the status quo, you don't need an EIS or you don't need NEPA. But the Secretary didn't issue the permit. How do those status quo cases fit in with your argument? And then also, how do they fit in with some of the cases that suggest if you're doing something that's beneficial for the environment, you don't need an EIS? Your Honor, I disagree with the interpretation of those cases that Ms. Abbasi presented in this respect. She said if the status quo on the ground doesn't change, then no EIS is required. And I think that a change in the legal status quo is relevant. For example, in the Douglas County v. Babbitt case, the change was from no critical habitat to critical habitat. That didn't change the status quo in those critical habitat areas. It just affected what activities could be done in the future in those areas. So it only changed the legal status quo, and still no EIS was required in that case because that was a beneficial impact. Here, I think the status quo is what would have happened if the Secretary had done nothing? And the answer is the right for DBOC to operate would have expired, and they would have been required to remove their property from the estero. And so I believe that that's the status quo that's relevant here. What's your support for that? Because, look, somebody comes in for an injunction, as they did here. One of the things that the district court needs to look at is should we keep the status quo? And at the time they came in, they had an oyster farm. How do you get from oyster farm as the status quo to no oyster farm as the status quo? Well, the status quo for a preliminary injunction might be different than the status quo for NEPA because, of course, in a preliminary injunction, the court is trying to decide should we leave everything on the ground in place the way it is until the legal issues here can be sorted out. But NEPA only requires analysis for a major Federal action. And so the failure to the refusal to exercise discretion to issue a new permit is not a major Federal action. It's Federal inaction, even if that causes the legal status quo to change in such a way that conditions on the ground have to change. I'm sorry. Oh, okay. If you're finished with that point, I do have another question. I am finished with that point. Okay. On a different subject. You had mentioned earlier that you don't read NEPA as in any way conflicting with, I guess, the Secretary's exercise of discretion. And I guess the problem I have with your reading of 124 is just sweeping aside NEPA as well, is that even if the Secretary is going to ultimately exercise his discretion weighing various policy considerations, there doesn't seem to me to be anything inconsistent with requiring him to go through the NEPA process to become fully informed before exercising that discretion. So why would we read the notwithstanding clause as getting rid of those kinds of procedural requirements? Well, as a practical matter, I think you should read it that way because both parties here did read it that way. Now, that's not an answer. I'm telling you, I don't give much weight to your quoting from that letter. I appreciate that. And the other more pertinent reason, I think, is the breadth of the notwithstanding clause. Both the Supreme Court and this Court have said that it is hard to imagine a clearer statement that the drafter of a statute or the drafter of a contract intends for other laws to be swept aside. And there's no distinction to be drawn there, I don't think, between procedural laws and substantive laws that might affect the decision. What our case law says is that it sweeps aside conflicting laws, and that's what I'm saying. And it doesn't seem to me to be – there to be any conflict between going through the NEPA process and the Secretary exercising the discretion that 124 gives him. Well, it is possible to imagine that a conflict could arise, and one, in fact, did in this case. One of the issues that DVOC believes was a procedural failing of the Secretary here is the failure to wait that 30-day waiting period, which she said was so important for public input. Now, that sets aside the fact that if the Secretary had waited that long, his authority under Section 124 would have expired, because Section 124 only provided the Secretary authority to issue the permit up until November 30th, 2012. So if the Secretary had waited that long, then there would have been a conflict. The Secretary would have followed the procedures of NEPA and, as a result, would not have been able to exercise one way or another the discretion that Congress granted him. And as a result, that's why DVOC urged the Secretary to go ahead and act in derogation of the procedures of NEPA that they now claim are so important. They said, you don't need to wait 30 days. Go ahead and make your decision. And so there was a potential there for a conflict that I think the Secretary was allowed to disregard the procedure of NEPA so that he could go ahead and fulfill or at least make a meaningful decision under Section 124, whether to act or not. Kagan, if we were to disagree with your jurisdictional arguments and to conclude that NEPA does apply, would you address the breaches, the procedural breaches that Drake's Bay has alleged with respect to the merits of the merits side of the denial of the preliminary injunction? Yes. I heard several procedural breaches in Ms. Abbasi's argument. One is the waiting period, which I already addressed. I think that following that waiting period would have made it impossible for the Secretary to have a meaningful exercise of his discretion one way or another prior to November 30, 2012. Another is, she mentioned, a failure to respond to comments about harbor seals. I think, really, that's an issue that wasn't directly raised in the briefs. If it had been, then we would have pointed to the sections in the EIS, which I believe actually are cited in our supplemental excerpts, in which the Secretary responded to those criticisms and explained how he used the harbor seal data, as well as the use of proxy data for measuring decibel levels. In fact, the National Academy of Sciences, although it did say that the Park Service had reached some conclusions that had a moderate to high degree of uncertainty, also said, I think in the very next sentence, that it's not clear what else the Park Service could have done, given the lack of data that is directly relevant to Drake's Estero. So I think that the scientific violations of NEPA that DBOC is alleging, although they're not clearly presented in the brief as a reason for the Secretary's discretion to have been arbitrarily exercised, there's really nothing there. Their brief really claims that a lot of other parties have found problems with the use of scientific data that the Secretary included in the EIS here, but they don't really point out any of those areas and argue them as a basis for an arbitrary and capricious decision here. So for that reason, if this case were sent back to the district court to consider the merits, I think that the Park Service and the Secretary would prevail on those NEPA claims. I'd also like to address, unless you have another question. Go ahead and make your point first. On the merits of this case, there's also the issue of California's retained rights that Ms. Abbasi brought up, and the question of whether the Department of the Interior's position has changed, whether California's retained rights do stand as an obstacle to a wilderness designation in Drake's Estero. And the first thing that I want to point out on that is even if California does have some rights, that doesn't stand as an obstacle to the Secretary's exercise of his discretion in the way that he did here. Whether this area is wilderness, potential wilderness, or just another area of the national seashore, commercial activities are prohibited unless the Secretary exercises his discretion to allow it. And so if California's retained rights are an obstacle, they're not necessarily an obstacle to the decision in this case. But I'd also like to point the Court to the statements of the California State agencies in the record. Three different agencies, the State Lands Commission, the California Coastal Commission, and the Department of Fish and Wildlife, have all written to the Park Service to say the Park Service is primary management authority of these areas, and the public right to fish does not include aquaculture. And the one California state agency to come to a different conclusion, the Fish and Game Commission, has said our right to lease the water bottoms of Drake's Estero is nonetheless contingent on a concurrent reservation and special use permit issued by the Secretary. So no matter what rights California may retain, they don't stand in the way of the decision that the Secretary made. Let me ask you something that's sort of near and dear to me as a district court judge. Does the appellant in this case have standing to challenge the designation of or I should say redesignation as Drake's Estero, since the argument can be made that the injuries are not traceable to it? The government's position is that they do not have standing to challenge that Federal Register notice. And it's for the reason that I just stated. Whether it is potential wilderness, wilderness, or no wilderness at all, they have no right to a special use permit. The special use permit is a discretionary matter on behalf of the Secretary. And so the only decision from which any injury flows that they allege is the Secretary's decision not to exercise his authority under Section 124. And so for that reason, the Federal Register notice is essentially a red herring here. I don't think that they have standing to raise that issue. Can I just bring you back to the thing that gives me the most pause about your argument? I thought you agreed with me at the outset that Section 124 was an effort by Congress to take its thumb off the scale. And I'm just wondering, would you agree with me that, in fact, what Congress was trying to indicate to the Secretary is that, notwithstanding whatever past policy declarations we've made, particularly in the 1976 Act, we may no longer be of the same view, right? That we did indicate, I guess it was in that House Conference Committee report, that basically we want, you know, as soon as practicable for all nonconforming uses to be removed. We know we said that before. Forget about that. Maybe we've had a change of heart. But if I were to read Section 124 as conveying that view of Congress, I just can't reconcile that with the Secretary's decision, because I'll just read this one passage. He says, I gave great weight to matters of public policy, particularly the public policy inherent in the 1976 Act of Congress. And I just read him as saying, I'm basically, you know, my decisions are being driven by what I read Congress's direction to me to be. And that seems, I read Section 124 as saying, no, you've, you guys have misinterpreted that in the past. I think that you may be over-reading what the Secretary said there. I think that he did not feel constrained by the 1976 Wilderness Act. But he still recognized the important public policy in favor of wilderness that has existed not only in the 1976 Act, but also in the Point Reyes Wilderness Act, in the 1984 California Wilderness Act, through National Park Service policies. And in this Court's cases, which have held that commercial activities are inappropriate for wilderness areas. I think it's also important to look at the context in which Section 124 was passed, as Ms. Abbasi said. Congress had before it a proposal that would have required the Secretary to issue a new special use permit to DBOC. But Congress didn't vote for that proposal. They replaced it with language that gave the Secretary authority. And there's legislative history specific to Section 124 that said the Secretary is supposed to have discretion as a result of that. So I think that what Congress was saying is not DBOC should get a permit or we don't care about wilderness anymore, but rather it's up to the Secretary. They can have a permit, despite our previous statements in the 1976 Wilderness Act, but they don't have to. And we're going to leave it to the Secretary to decide. Roberts. But I mean, I actually think the context out of which Section 124 arose cuts against you, because you're right that Congress almost said we're going to make this policy judgment for you. And we actually think that the special use permit should be granted. But instead it stepped back. And as I said, a reasonable reading, it seems to me, is that it said forget about any general declarations of policy, and in particular forget about the specific declarations of policy with respect to this location. Go make your decision based on other considerations, perhaps. I agree that that change is meaningful. But what it means is Congress didn't have the votes to give DBOC a new permit and gave that decision to the Secretary itself. If you're going to take away wilderness values and say to the Secretary, use whatever other considerations you think are meaningful, then it's not clear what would be on the side of the scale weighing against DBOC. And Congress would have just said DBOC should get a permit, because the only value that we don't care about anymore is wilderness. And so the only value here is the value to the public of DBOC's continued operation. But I don't think that's the case. So what is the role, then, of the wilderness value? How does it figure in to the Secretary's decision? I think the Secretary looked at the decision that was before him and said, Congress has cleared away legal constraints that I must respect. So what is the best use of the park? What are the various policies with respect to land use in this area that I administer? And what is the best experience, not just for the 50,000 visitors a year that might visit DBOC, but for the 2 million visitors a year that are visiting Point Reyes National Seashore? And how do I give them the best visitor experience as I can, which, after all, as Secretary of the Interior, is my mission. That's what Congress has asked me to do. And wilderness is necessarily an important value in that. It's one of the uses not only in Point Reyes National Seashore, but in the entire national park system. And it's upheld in NPS's management policies as well as in this Court's cases. Now, I see that my time is almost out, and I have one more point that ---- You've actually exceeded your time, but please make your final point. Okay. We haven't talked much about the equities in this case. And so I'd like to make one point about the equities that the District Court found to be particularly persuasive here. And that is the bargain that the parties struck in 1972. At that time, the area that is in dispute here became federal land, but the federal government couldn't decide what to do with it. The parties contemplated, though, that in 2012 the United States would get to make a decision about that, would get to either extend the special use permit or would get to return this land to other uses that are consistent with uses at the Point Reyes National Seashore. Now, Johnson Oyster Company and Drake's Bay got everything that they could have wanted out of that bargain. They got their 40 years. The equitable result now is to allow the Secretary to make that decision about what is the best use of Point Reyes National Seashore for all of the other visitors that go every year. And that's why an injunction is not appropriate in this case, and the Court should affirm the judgment of the District Court. Thank you. Mr. Blackman, could you add three minutes to Mr. Bassi's rebuttal time, please? Thank you. Your Honor, there's a couple of points I just want to make with respect to counsel's characterization of some of our arguments. First, deficiencies with respect to the seal data in the final statement were put on the record in December at ER 0291, the declaration of Dr. Cory Goodman. This is something that's been known since shortly after the Secretary's decision that this data was flawed. I want to talk first about the bargain. As I noted before, the bargain contemplated that there could be an extension by a special use permit. Yes, that was a discretionary decision, but the purpose of the APA and NEPA is to regulate how agencies make decisions, to ensure that those decisions are made on a rational basis, on the basis of sound science. The Secretary did not make that decision. He made a decision on the basis of flawed data or on data that was disregarded. He couldn't have made the decision that was required. The Farm didn't get the benefit of the bargain. What they were entitled to was a decision about whether a permit would be granted in 2012 on the basis of facts and science. That is not what they got. They got an arbitrary decision that appears to have been based on the Secretary's belief that granting the permit would violate the law. This is in his decision. He does not simply say that, you know, he doesn't feel constrained by the law. He says it would violate the 1976 Act for me to grant this permit. That is a fundamental misinterpretation of the law. The equities here support issuance and injunction. And the district court was in legal error to find the contrary. She made two different legal errors. One is by weighing an inappropriate factor, which is the expectations of the Farm in 2012, which should have been wiped out by the change of the landscape, legal landscape, in 2009 by passage of Section 124. But she also failed to consider the public interest in decisions being made in a lawful, reasoned manner on the basis of science. The Secretary Was there such a conflict in the science, though, that would compel the Secretary to have decided in Drake's favor? Because what I struggle with here is, on the one hand, you acknowledge that the Secretary has unfettered discretion within the bounds of the APA and other laws that dictate how he must exercise them in a constitutional manner. But then on the other hand, you seem to say he could only exercise his discretion in favor of maintaining Drake's Bay and couldn't return it to what it naturally exists as, and that is wilderness. No, Your Honor. That's not our position. Okay. We noted in the letters that counsel discussed that he could decide to issue the pharma permit without the completion of NEPA, because at that point it would have been impossible for him to do so. And as we discussed earlier, if a decision is made that doesn't change the status quo, if he was extending the permit on the same grounds, NEPA wouldn't have been required in the first place. But here, where we have the National Academy of Science noting that there is serious questions with the agency's conclusions, and we have that acknowledged by Congress when they specifically direct in 2011. There is a difference between saying that there are serious questions with the agency's conclusions are wrong based upon the science? We believe the secretary's conclusions are wrong based upon the science. But my point here is that if there are serious questions about the agency's conclusions, NEPA applies. In the presence of this controversy, what has to be done is the agency has to take a step back and it has to say we need to make this fully informed decision in order to be fair. That's not what they did. And what they did instead was to ignore the public interest in preserving this 80-year-old farm, to ignore the public interest in making decisions on the basis of law and sound science, and to the detriment of the farm, the community, the entire country. Thank you. The case just argued, Drake's Bay v. Jewell, is submitted. I'd like to thank counsel for your excellent briefs as well as the various amicus briefs, and also compliment Ms. Abbasi and Mr. Gunter for your very helpful arguments this morning. We will take a short recess, and on return, if counsel for United States v. Pollack can be ready to argue. Thank you. All rise.
judges: Marbley, McKeown, Watford